# C. C. JULIAN OIL & ROYALTIES CO.
## v. CAPSHAW et al.

No. 21640.   Opinion Filed Oct. 14, 1930.

John Head, for petitioner.

J. Berry King, Atty. Gen., W. L. Murphy, Asst. Atty. Gen. (C. B. Ames, of counsel), for respondents.

E. S. Ratliff, for Corporation Commission.

Geo. A. Henshaw, C. C. Herndon, J. C. Denton, W. C. Franklin, J. W. Finley, R. L. Gordon, T. J. Flannelly, Joe T. Dickerson, P. J. Carey, George Otey, Frank B. Burford, Alvin F. Molony, Harry H. Smith, W. P. Z. German, Harry O. Glasser, McKeever, Elam & Stewart, Nathan Scarritt, and E. S. Champlin, amici curiae.

GREEN, Special Justice. This is an original proceeding in this court in which the plaintiff seeks a writ of prohibition against the Corporation Commission of the state of

Oklahoma to prohibit the enforcement by said Commission of certain orders, rules, and regulations adopted by the Commission to prevent waste of crude oil in the state of Oklahoma.

The Corporation Commission, respondents herein, filed a response to which was attached copies of said orders, together with copies of the proceedings leading up to the orders themselves. In substance, the several orders and modifications thereof pleaded by respondents provide for a comprehensive plan of conservation and proration of crude oil produced in the flush and semi-flush production pools of the state, including the Oklahoma City pool, in order to prevent economic waste, underground waste, surface waste and waste incident to production of crude oil or petroleum in excess of transportation or market facilities and reasonable market demand.

The orders classify the several oil producing fields of the state and provide, among other things, that each producer in said field so classified and described might take from such pool or area only such proportion of all crude oil and petroleum that might be produced therefrom, under said order, as the production of the well or wells of such owner in said pool bore to the total potential production of such pool or area. Said orders also provide for an umpire, operator's committees, agents, etc., to carry out the provisions of said order and regulations.

The plaintiff in its petition contends that the Corporation Commission was without authority to make the orders complained of, in that the oil conservation laws of the state of Oklahoma did not confer such authority upon it; and second, if it should be held that such authority was conferred or attempted to be conferred under said conservation laws, that the same was violative of the state and federal Constitution, and in its brief states its contention as follows:

"(1) The law itself is unconstitutional.

"(2) Many provisions of the law are unconstitutional.

"(3) The act itself, even if valid in all its provisions, does not confer the authority attempted to be exercised.

"(4) The orders go far beyond the provisions of the law, and to such extent are invalid.

"(5) The act itself says the Commission shall prevent unreasonable discrimination in favor of one·common source of supply as against another. The orders are discriminatory and therefore void."

The applicable sections of the statute involved are:

"Section 7954, C. O. S. 1921: Waste prohibited. That the production of crude oil or petroleum in the state of Oklahoma, in such manner and under such conditions as to constitute waste, is hereby prohibited."

"Section 7956. Waste defined—Protection. That the term 'waste' as used herein, in addition to its ordinary meaning, shall include economic waste, underground waste, surface waste, and waste incident to the production of crude oil or petroleum in excess of transportation or marketing facilities or reasonable market demands. The Corporation Commission shall have authority to make rules and regulations for the prevention of such waste, and for the protection of all fresh water strata, and oil and gas bearing strata encountered in any well drilled for oil.

"Section 7957. Production regulated—discrimination of purchaser prohibited. That whenever the full production from any common source of supply of crude oil or petroleum in this state can only be obtained under conditions constituting waste as herein defined, then ·any person, firm or corporation, having the right to drill into and produce oil from any such common source of supply may take therefrom only such proportion of all crude oil and petroleum that may be produced therefrom, without waste, as the production of the well or wells of any such person, firm or corporation, bears to the total production of such common source of supply. The Corporation Commission is authorized to so regulate the taking of crude oil or petroleum from any or all such common sources of supply, within the state of Oklahoma, as to prevent the inequitable or unfair taking from a common source of supply of such crude oil or petroleum, by any person, firm, or corporation, and to prevent unreasonable discrimination in favor of any one such common source of supply as against another."

"Section 7959: Enforcement of act—hearings before Corporation Commission. That any person, firm or corporation, or the Attorney General on behalf of the state, may institute proceedings before the Corporation Commission, or apply for a hearing before said Commission, upon any question relating to the enforcement of this act, and jurisdiction is hereby conferred upon said Commission to hear and determine the same. Said Commission shall set a time and place, when and where such hearing shall be had and give reasonable notice thereof to all persons or classes interested therein, by publication in some newspaper or newspapers, having general circulation in the state, and in addition thereto, shall cause reasonable notice in writing to be served personally on any person, firm, or corporation complained

against. In the exercise and enforcement of such jurisdiction, said Commission is authorized to determine any question or fact, arising hereunder, and to summon witnesses, make ancillary orders, and use mesne and final process, including inspection and punishment as for contempt, analogous to proceedings under its control over public service corporations, as now provided by law."

It is first contended that the act of the Legislature in question is invalid for the reason it is in conflict with section 57 of article 5 of the Constitution of Oklahoma, which provides that every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title. This act is not in conflict with said section, because the act does embrace but one subject. to wit, prevention of waste of oil, and said subject is clearly expressed in the title. This section was construed in Ex parte Ambler. 11 Okla. Cr. 449, 148 Pac. 1061; Oklahoma Light & Power Co. v. Corporation Commission, 96 Okla. 19, 220 Pac. 54; Griffin v. Thomas, 86 Okla. 70, 206 Pac. 604. Under the authorities above cited, it was held that if the act has but one general subject that is fairly indicated by the title, it may have many details, but if they all relate to the same general subject or object they are properly included therein. The purpose of this provision of the Constitution was to forbid the Legislature from embracing in any one act two or more unconnected subjects.

It is next contended that the act under consideration confers non-delegable powers on the Corporation Commission. A careful reading of the foregoing sections of the statute will disclose that the major purpose of said legislation is to prohibit the waste of oil in this state, and it is not void in that it confers non-delegable powers on the Corporation Commission. See Ex parte Tindall, 102 Okla. 192, 229 Pac. 125; Insurance Company v. Welch, 49 Okla. 620, 154 Pac. 50; Quinton Relief Oil & Gas Co. v. Corporation Commission, 101 Okla. 164, 224 Pac. 156; Plymouth Coal Co. v. Commonwealth of Penn., 232 U. S. 532, 6 R. C. L. 179.

Neither is the act void for uncertainty. The record discloses that after hearing was had the respondent Corporation Commission found, in substance, that the potential production in the Oklahoma City pool was much greater than the marketing and transportation facilities, and the statutes above quoted clearly authorized it to make the order complained of under the definition of "waste" in section 7956, supra. See Quinton Relief Oil & Gas Co. v. Corporation Commission, supra: Ex parte Daniel (Okla. Cr.) 273

Pac. 1010; C., R. I. & P. Ry. Co. v. State, 23 Okla. 94, 99 Pac. 901.

It is contended by plaintiff that no notice, or at least no proper notice was given it prior to the promulgation of said orders. But, as respondents appear to have acted under section 7959, C. O. S. 1921, supra, the notice pleaded would appear to be sufficient in the absence of either allegation or proof that plaintiff was prejudiced thereby, or had no notice of the proceeding in which the orders were made.

This brings us to an examination of the statutes involved, and the procedure authorized thereunder, to discover if the orders complained of are on their face valid, since the reasonableness of same cannot be inquired into in this character of attack.

Statutes such as those under consideration are based largely on the police power of the state; and while this power is more or less elusive and difficult to define, this difficulty results largely from the fact that it (the police power) is plastic in its nature and accommodates itself to every change of conditions which calls for its application. Its nature and scope is well stated in R. C. L. section 182, as follows:

"The police power is an attribute of sovereignty, possessed by every sovereign state, and is a necessary attribute of every civilized government. It is inherent in the states of the American Union and is not a grant derived from or under any written Constitution. It has been said that the very existence of government depends on it, as well as the security of social order, the life and health of the citizens, and the enjoyment of private and social life and the beneficial use of property. It has been described as the most essential, at times the most insistent, and always one of the least limitable of the power of government." .

This court in Ex parte Tindall, 102 Okla. 192, 229 Pac. 125, in the 6th paragraph of the syllabus said:

"The police power is an attribute of sovereignty, inherent in every sovereign state, and not derived from any written Constitution, nor vested by grant of any superior power.

"The term 'police power' comprehends the power to make and enforce all wholesome and reasonable laws and regulations necessary to the maintenance, upbuilding, and advancement of the public weal, and protection of the public interests.

"It is plastic in its nature and will expand to meet the actual requirements of an advancing civilization and adjust itself to the necessities of moral, sanitary, economic and political conditions.

"No principle in our system of government will limit the right of government to respond to public needs and protect the public welfare."

In this connection it cannot be disputed that the production of petroleum and its various products is one of the major industries of the state, and one in which many of its citizens are vitally concerned. The almost universal use of oil, gasoline and other petroleum products, together with the fact that a major portion of the revenues to support our educational and eleemosynary institutions and other departments of state government is derived from taxes levied upon this industry, makes the conservation of this great natural resource a matter of grave concern to the state and every citizen thereof. Notwithstanding the magnitude and importance of the oil industry, it is one of the natural resources which is peculiarly susceptible of waste and dissipation, and when it once escapes can never be recovered.

In 2 Cooley's Constitutional Limitations, (8th Ed.) pages 1319-1320, it is said:

"The Legislature may also regulate and restrict the use and enjoyment of landowners of the natural resources of the state, such as subterranean waters, gas, oil and timber, so as to protect them from waste and prevent the infringement of the rights of others. Such legislation does not infringe the constitutional inhibitions against the taking of property without due process of law, denial of the equal protection of the laws, or taking property without just compensation."

In practically all of the oil producing states of the Union, laws have been enacted looking to the conservation of, and the prevention of waste in the production of both oil and gas. In Ohio Oil Co. v. Indiana, 177 U. S. 190, the Supreme Court of the United States affirmed a decision of the Indiana Supreme Court which held valid an act of that state, passed in 1893, which provides that it shall be unlawful to permit the flow of gas or oil from a well to escape in the open air for more than two days after gas or oil shall have been struck in the well, and that thereafter all such oil and gas should be securely confined in such well, pipes or other safe and proper receptacles. The suit was brought by the state of Indiana for an injunction to restrain the Ohio Oil Company from permitting the escape into the open air of gas from certain oil wells in that state. The company pleaded that both oil and gas were produced from the same sand; that it was impossible to produce the oil without

producing the gas; that it had no market for the gas, and that to enforce the statute would deprive it of its property without "due process of law" and without compensation.

After discussing and defining the nature of property in oil and gas while yet in the earth, and the rights and duties of the several owners of the surface to a common pool, the court said:

"On the other hand, as to gas and oil the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property. But there is a coequal right in them all to take from a common source of supply the two substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of the things as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right to the detriment of the others, or by waste by one or more to the annihilation of the rights of the remainder. Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment, by them, of their privilege to reduce to possession, and to reach the like end by preventing waste. This necessarily implied legislative authority is borne out by the analogy suggested by the things **ferae naturae,** which it is unquestioned the Legislature has the authority to forbid all from taking, in order to protect them from undue destruction so that the right of the common owners, the public, to reduce to possession, may be ultimately efficaciously enjoyed. Viewed, then, as a statute to protect or to prevent the waste of the common property of the surface owners, the law of the state of Indiana which is here attacked because it is asserted that it divested private property without due compensation, in substance, is a statute protecting private property and preventing it from being taken by one of the common owners without regard to the enjoyment of the others. Indeed, the entire argument upon which the attack on the statute must depend involves a dilemma, which is this: If the right of the collective owners of the surface to take from the common fund, and thus reduce a portion of it to possession, does not create a property interest in the common fund, then the statute does not provide for the taking of private property without compensation. If on the other hand, there be, as a consequence of the right of the surface owners

to reduce to possession, a right of property in them * * * in the common reservoir of supply, then, as a necessary result of the right of property, its indivisible quality, and the peculiar position of the things to which it relates, there must arise the legislative power to protect the right of property from destruction. To illustrate by another form of statement the argument is this: There is a property in the surface owners in the gas and oil held in the natural reservoir. Their right to take cannot be regulated without divesting them of their property without adequate compensation, in violation of the Fourteenth Amendment, and this although it be that if regulation cannot be exerted one property owner may deprive all the others of their rights, since his act in so doing will be **damnum absque injuria.** This is but to say that one common owner may divest all the others of their rights without wrongdoing, but the lawmaking power cannot protect all the owners in their enjoyment without violating the Constitution of the United States."

In the case of Lindsley v. Natural Carbonic Gas Company, 220 U. S. 61, the Supreme Court of the United States held:

"It is within the power of the state, consistently with due process of law, to prohibit the owner of the surface by pumping on his own land, water, gas and oil, to deplete the subterranean supply common to him and other owners to their injury; and so held that the statute of New York protecting mineral springs is not, as the same has been construed by the Court of Appeals of that state, unconstitutional as depriving owners of their property without due process of law. Ohio Oil Co. v. Indiana, 177 U. S. 190."

In the case of Walls v. Midland Carbon Company, 254 U. S. 300, the Supreme Court of the United States sustained a statute of Wyoming which prohibited as wasteful the burning and consumption of natural gas in the manufacture of carbon. This statute limited the prohibition against such use of said gas to gas wells that were situated within ten miles of any incorporated town or industrial plant, and permitted the gas from all other wells in said state to be used for such purpose. The court held that this was not an unreasonable nor arbitrary classification. It was also shown that the enforcement of the statute would destroy a heavy investment already made in plants for the manufacturing of carbon black, but this was not sufficient in the opinion of the court to strike down the statute.

In the case of Oxford Oil Co. v. Atlantic Oil Co., 22 Fed. (2nd) 597, it was held that it is within the power of the Legislature to lay down a general rule for the protection of mineral rights of the adjoining landowners and to leave the details of enforcing

that rule to an administrative agency or board. In this case it was also held that a rule or an order promulgated by the Texas Railway Commission prohibiting the drilling of oil and gas wells nearer than 150 feet to any property line without special permit did not violate any constitutional rights and was therefore valid.

In the case of Bacon v. Walker, 204 U. S. 312, the Supreme Court of the United States had under consideration a statute of the state of Idaho prohibiting the herding of sheep within two miles of the premises of others. The statute was attacked, first, on the ground that the plaintiff in error had an equal right with other citizens to pasture his stock upon the public domain, and to enforce that statute against him was to take property without due process of law, and second, that the statute arbitrarily and unlawfully discriminated against him, as between citizens engaged in the grazing of other classes of stock. The court denied both contentions and sustained the law as a proper exercise of the police power, basing its opinion largely on the case of Ohio Oil Co. v. Indiana, supra.

The case of Winkler v. Anderson, 104 Kan. 1, 177 Pac. 521, sustained a statute of Kansas making it unlawful to drill or operate oil or gas wells within 100 feet of the right of way of any steam or electric railway. The facts showed that the party attacking the statute had a lease on a strip of land about 50 feet in width parallel with and adjoining a railroad right of way and upon which there were two producing wells; and that the enforcing of the statute would render the same valueless. The court sustained the statute on the ground that under the police power of the state the Legislature had a right to protect the public, and the court was unable to determine that the statute in question was unreasonable.

In the case of Marrs v. City of Oxford, 24 Fed. (2nd S.) 541, the federal district court upheld a city ordinance in the state of Kansas regulating the drilling upon town lots and among other things held that oil and gas, while in the earth, were susceptible of only a qualified ownership, which is the rule adopted in this state (Rich v. Doneghey, 71 Okla. 204, 177 Pac. 86), but even if it be property in the strict sense, the right of a landowner to produce same is subject to the police power of the state, and that the owner must use this property so that he will not injure another, and that where the provisions of the ordinance were generally reasonable it would not be held invalid because better or more scientific pro-

visions might be suggested. This case was affirmed on appeal (see 32 Fed. [2nd S.] 134) ; and petition for writ of certiorari was denied by the Supreme Court of the United States. See 280 U. S. 573, 74 Law Ed. 625.

Other authorities bearing on the questions above discussed are: C. B. & Q. R. Co. v. People, 200 U. S. 561; Oxford Oil Co. v. Atlantic Oil. & Producing Co. (D. C. Tex.) 16 Fed. (2nd.) 639; Summers Oil & Gas, sections 22 to 38; Duluth & Oklahoma Oil Co. v. Lane, in cause No. 246, Equity Western District of Oklahoma (unreported) ; Rich v. Doneghey, 71 Okla. 204, 177 Pac. 86; Commonwealth v. Trent, 117 Ky. 34, 77 S. W. 390; Ex parte Elam (Cal. App.) 91 Pac. 811; Humble Oil & Refining Co. v. Strauss (Tex. Civ. App.) 243 S. W. 528; State v. Thrift Oil & Gas Co. (La.) 110 So. 188; Pawhuska Oil & Gas Co. v. City of Pawhuska, 47 Okla. 342, 148 Pac. 118.

Plaintiff contends that sections 7954 prohibiting, and 7956 defining "waste" are vague, uncertain and therefore void. Section 7954 prohibits "waste"; section 7956 defines "waste" by saying that in addition to its ordinary meaning it shall include "economic waste, underground waste, surface waste, and waste incident to the production of crude oil or petroleum in excess of transportation or marketing facilities or reasonable market demands." Can it be seriously contended that these terms are meaningless? This state maintains a great school of petroleum engineering, and the Legislature evidently had, and the Corporation Commission may procure the assistance of experts in determining the terms used in the statute if necessary or expedient. The finding of the Corporation Commission that the potential production of the Oklahoma City field is far in excess of the transportation and marketing facilities, and that to permit same to be produced in excess of transportation facilities, market demands or proper storage facilities would result in physical waste, clearly states a case of physical waste so elementary and plain that any one may understand. There is nothing in this record to indicate that either of the terms applied to "waste." such as "economic waste," etc., is not capable of exact determination by the Corporation Commission if and when such determination becomes necessary.

The terms used to define the various kinds of oil waste are no more technical nor indefinite than those used in the gas conservation statute defining "waste" of gas. That act was before this court in the case of Quinton Relief Oil & Gas Co. v. Corporation Commission, supra, in a proceeding identical with this, and the validity of the act was assailed on the same grounds as the oil conservation act is being assailed here. Sustaining the act in toto this court said:

"The Act of 1915 defined 'waste' to include the escape of natural gas in commercial quantities into the open air, the drowning of gas stratum with water, the permitting of any natural gas well to wastefully burn, and the wasteful utilization of such gas. The act in plain language provides that a gas well producing 2,000,000 cubic feet per day should be considered a commercial well and makes it the duty of pipeline companies to purchase ratably from all producers in the field; provides civil and criminal remedies for the violation of the act; vests the Corporation Commission with jurisdiction to enforce it and grants appeals from the Commission's order to the Supreme Court. It is obvious, under these statutory provisions, the Commission had jurisdiction to enter the orders in question.

"Counsel for petitioner insists that the Legislature has failed to define what constitutes wasteful utilization of gas but has delegated to the Corporation Commission the power to determine that fact, and this constitutes an unlawful delegation of power and renders the act unconstitutional. We are unable to concur in the contention of counsel for the petitioner that the Act of 1915 repealed section 4319, Revised Laws 1910 * * * or that said Act of 1915 is unconstitutional by reason of the power delegated to the Corporation Commission for uncertainty in its provisions. In construing various legislative enactments relating to the same subject, such enactments shall be construed together and given effect as a whole, if possible, in order to accomplish the purpose for which such acts were passed. Brown v. Miller et al., 89 Okla. 287, 215 Pac. 748."

On page 158 the court said:

"We are clearly of the opinion that the Act of 1915, supra, is a valid act. The power of the Commission to regulate the burning of natural gas for the production of carbon black or soot in enforcing the conservation policy of the state is definitely settled in favor of the state in the case of Walls v. Midland Carbon Company, 254 U. S. 300."

It is seriously contended by plaintiff that article 9 of the Constitution, which created the Corporation Commission and defined its powers and jurisdiction, did not authorize the proceeding had in this case. With this contention we do not agree. But even if the point be conceded, article 5, section 36, of the Constitution provides:

"The authority of the Legislature shall extend to all rightful subjects of legislation, and any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or

exclusion of such authority upon the same or any other subject or subjects whatsoever."

And, under this authority, the Legislature was authorized to enact the conservation law herein discussed and to delegate to the Corporation Commission or any other suitable administrative agency the duty of enforcing the same. In the case of State ex rel. v. Hooker, County Judge, 22 Okla. 712, 98 Pac. 964, Chief Justice Williams, construing the above section of the Constitution, held that it was adopted as a precaution to exclude the idea of the exclusion of power by implication. At page 719 he said:

"In creating the legislative department, and in conferring upon it the legislative power, the people must be understood to have conferred the full and complete power as it rests in, and may be exercised by, the sovereign power of any country subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States. The legislative department of a state is not made a special agency for the exercise of specifically defined legislative powers, but is intrusted with the general authority to make laws at discretion."

The above excerpt was copied and cited with approval in Anderson v. Ritterbusch, 22 Okla. 761, 98 Pac. 1002.

That portion of the Oil Conservation Act involved in this proceeding has been in effect and has been administered by the Corporation Commission for many years, and was before this court in the case of Love v. Boyle, 72 Okla. 300, 180 Pac. 705, as early as 1919. Every reasonable presumption will be indulged in favor of the constitutionality of a statute, and the same will be upheld unless its conflict with the Constitution is clear and certain.

This rule is particularly applicable and the presumption is especially strong when the statute has been long acquiesced in and has been treated as valid by the various departments of government. 12 C. J. 798; Reeves v. State, 36 Okla. Cr. 186, 253 Pac. 510.

Section 7955, C. O. S. 1921, which is section 2 of the Oil Conservation Law of 1915, is not involved in this action, and it is not to be assumed that if the Corporation Commission were attempting to fix the market value of oil under that section, we would sustain same; but we do hold that the act as a whole provides a valid method of preventing waste of the oil of this state; that the same is a proper exercise of the police power of the state; and that plaintiff has not been deprived of any of its constitutional rights.

The writ is therefore denied.

HUNT, CLARK, SWINDALL, and ANDREWS, JJ., concur.

LESTER, V. C. J., concurs in the conclusion.

RILEY and CULLISON, JJ., dissent.

HEFNER, J., disqualified, not participating; Hon. Guy Green, of Waurika, being duly appointed to serve as Special Justice.

---

Supplemental Opinion.

CLARK, J. On the 9th day of September, 1930, oral argument was had in this cause and said cause was submitted to the Supreme Court for a decision on the questions involved, as more fully appears from the original opinion herein. Subsequently thereto, the court prepared and adopted the original opinion herein, but the same was not filed with the clerk of this court and had not become the judgment of the court.

Thereafter, on October 1, 1930, plaintiff, by his attorney, John Head, filed a motion herein to dismiss his cause of action, which motion is in words and figures as follows:

"Comes now the complainant, C. C. Julian Oil & Royalties Company, and dismisses this action, without prejudice."

The Attorney General of the state of Oklahoma, appearing for the Corporation Commission, filed herein objections to dismissal of said cause.

In this action is involved the constitutionality of the statutes of Oklahoma (more particularly set out in the original opinion) providing a plan or method for the prevention of waste of crude oil in Oklahoma and giving the Corporation Commission of Oklahoma power and authority to enforce the provisions of said statute.

Petitioner attached to his motion to dismiss a statement which contains the following: "We expect to continue to fight until we get relief or until the doors are closed behind us." Inasmuch as the constitutionality of the statute is involved and the general public is thereby interested, this court will retain jurisdiction of this cause and pass on the constitutionality of the statutes that public officials may be advised as to their duties and rights under the statute involved.

This court in the case of Dove v. Oglesby, 114 Okla. 144, 244 Pac. 798, in the sixth paragraph of the syllabus, said:

"Although the time may have passed for granting the specific relief asked for in this

case, yet, inasmuch as the constitutionality of a statute is involved, and the general public thereby interested, the court will retain jurisdiction of the appeal, and pass upon the constitutionality of the statute."

This court in Taylor v. Green, 119 Okla. 297, 249 Pac. 393, in the first paragraph of the syllabus, said:

"After a case is finally submitted to a court or jury, the plaintiff has no legal right to dismiss his case without prejudice. It is a matter resting in the sound discretion of the court, and its ruling will not be reversed unless it appears that such discretion has been abused."

In the case of Taylor v. Green, supra, the case of Dickerman v. Crane (Kan. App.) 57 Pac. 305, was cited with approval. The second paragraph of the syllabus of that case reads as follows:

"After a final submission of a case to a court or jury, the plaintiff has no legal right to dismiss his case without prejudice. It is a matter resting in the sound discretion of the court, and its ruling will not be reversed unless it appears that such discretion has been abused."

Also McKinley v. Schull (Kan.) 212 Pac. 898, was cited with approval. In the case of Dove v. Oglesby, supra, at page 800, this court cited with approval the fol'owing cases:

In Memphis St. Ry. Co. v. Rapid Transit Co., 133 Tenn. 99, 179 S. W. 635, the Supreme Court of Tennessee said:

"The Supreme Court on appeal has jurisdiction and will determine the constitutionality of a law, although the cause can be decided upon other grounds."

In State ex rel. R. R. Com'rs v. Southern Tel. & Con. Co., 65 Fla. 67, 61 So. 119, the Supreme Court of Florida said:

"Even though litigation may not be effective in a'l respects because of circumstances arising after appellate proceedings are taken, the appellate court does not thereby lose jurisdiction of the cause, and it may be retained for the determination of questions properly presented involving the duties and authority of public officials that are of general interest to the public."

In Re Fairchild, 151 N. Y. 359, 45 N. E. 943, the Court of Appeals of New York said:

"The respondent contends that, inasmuch as the election has been held, the decision of the questions presented on this appeal is of no importance, as it can, at most, only affect the question of costs. We think the questions involved are of sufficient importance to require their determination by

this court, as it may prevent future embarrassment in the congressional district to which this controversy relates, and also settle other questions upon which there is a conflict in the decisions of the Supreme Court."

In Commonwealth of Mass. v. Klaus, 130 N. Y. S. 713, 145 App. Div. 798, the court said:

"Appellate courts frequently pass upon questions affecting public interest, though the question has become moot in the particular case, and the appellate division will determine whether the statute permitting witnesses in this state to be subpoenaed to another state is constitutional, the special term having decided that it was invalid."

In Giles v. Harris, 189 U. S. 484, 23 S. Ct. 641, the Supreme Court of the United States said:

"Perhaps it should be added to the foregoing statement that the bill was filed in September, 1902, and alleged the plaintiff's desire to vote at an election coming off in November. This election has gone by, so that it is impossible to give specific relief with regard to that. But we are not prepared to dismiss the bill or the appeal on that ground, because to be enabled to cast a vote in that election is not, as in Mills v. Green, 16 S. Ct. 132, 159 U. S. 651, 657 (40 L. Ed. 293), the whole object of the bill. It is not even the principal object of the relief sought by the plaintiff. The principal object of that is to obtain the permanent advantages of registration as of a date before 1903."

We are of the opinion that this court should retain jurisdiction of this cause and settle the questions involved.

HUNT, SWINDALL, and ANDREWS, JJ., and GREEN, Special Justice, concur.

RILEY and CULLISON, JJ., dissent.

MASON, C. J., and LESTER, V. C. J., absent.

### Special Concurring Opinion.

HUNT, J. (concurring). This is an original proceeding in this court wherein C. C. Julian Oil & Royalties Company, an express trust, organized under the laws of Oklahoma, seeks a writ of prohibition against the Corporation Commission of this state composed of C. C. Childers, chairman, Fred Capshaw and E. R. Hughes.

The parties will be hereinafter referred to as petitioner and Commission. Petitioner seeks to prohibit the Commission from enforcing, as against it, certain orders and rules and regulations made by the Commission to prevent the waste of oil and

petroleum in certain oil fields in the state including what is known as the **Oklahoma City** field. Petitioner alleges it is the owner of an oil and gas lease covering three lots in an addition to Oklahoma City and that it has drilled an oil well thereon capable of producing 5,000 barrels of oil per day and that said premises are within the Oklahoma City field. It also alleges that there is a market demand at its well for crude oil at a price equivalent to the actual value thereof, and for the total production thereof, and that it has expended large sums of money in drilling its well and other wells in Oklahoma, and producing, transporting and preparing to refine the oil produced therefrom. Petitioner further charges that the Commission made and entered of record on June 30, 1930, order No. 5189, copy of which is attached to petition, whereby the Commission found that it was necessary to curtail the output of crude petroleum in Oklahoma from the potential capacity of all the wells in the state amounting approximately to 1,450,000 barrels per day to 650,000 barrels per day, and that by its order No. 5246, entered on July 24, 1930, the Commission reduced the total allowable production of crude oil in said state to 550,000 barrels per day, a copy of which last mentioned order is also attached to the petition herein, and alleges that under said order No. 5246 it is provided that only 18¾ per cent. of the total potential production of all the wells in the Oklahoma City field may be produced and that the operators committee and the umpire appointed by the Commission arbitrarily, and without right, reduced said percentage of allowable production to 8⅓ per cent. of the potential production of the wells in said field. Petitioner further charges that under said order 16 other oil fields in the state are allowed to produce 50 per cent. of their potential production, two fields 25 per cent., and five fields 18¾ per cent. and that many other fields in the state are not prorated at all. Petitioner further alleges that the members of the Commission and the umpire and operators committee for the Oklahoma City field have demanded that it comply with said orders and produce only 8⅓ per cent. of the potential capacity of its well therein and that the operators committee and the umpire have ordered the petitioner to shut in its well for 65 days and then produce it only one day out of twelve, and that the committee intends to and will, unless restrained or prohibited by the order of this court, carry out their threats to take charge of the properties of the petitioner and run the oil from petitioner's well under the orders of said umpire and operators committee and the said Commission, and further, that said Commission has threatened to punish petitioner for contempt, if it violates said orders and is threatening to and will, unless prohibited by order of this court, attempt to render said orders effectual by contempt proceedings against petitioner by instituting proceedings in court for appointment of a receiver for its property. Petitioner further contends that all of said orders and each of them are void for the following reasons:

(1) Because the law under which the Corporation Commission pretended to act in making said orders, namely, section 7954 to 7963, both inclusive, C. O. S. 1921, being the so-called "Oil Conservation Act," of the 1915 Legislature, is void because in violation of the Fourteenth Amendment to the Constitution of the United States, in that they have the effect of depriving petitioner of its property, without due process of law and deny to petitioner the equal protection of the laws, of section 7 of article 2 of the Constitution of Oklahoma, providing that no person shall be deprived of life, liberty or property without due process of law, and of section 2 of article 2 of the Constitution of Oklahoma, providing that every person has the inherent right of enjoying the gains of his own industry.

(2) That the provisions of the statute are too general and are so indefinite and uncertain that they are void.

(3) That they vest the Corporation Commission with legislative authority and hence are void.

(4) That if the statute be valid, the orders are nevertheless void, because they are not within the scope of the authority of said Commission as laid down by the said act of the Legislature.

(5) That said orders were entered in an ex parte proceeding, without notice to petitioner and without evidence in support thereof, and were in fact entered pursuant to an agreement entered into by a large number of the owners of oil wells in the Oklahoma City field whereby they agreed among themselves that they would cause to be taken such action as would restrain the amount of oil shipped by the railroad and through the pipe lines serving said field in interstate and intrastate commerce, and that said owners agreed among themselves that an operators' committee should be formed to determine the amount which could be produced by each operator in the field and the amount

which should be run through the pipe lines.

(6) That the order delegated nondelegable power to an umpire and operators' committee to make orders as to the proration of production in said field and to increase or decrease the allowable percentage of production therein and to instruct the pipe lines and railroads as to their takes of oil from the field.

(7) And that said orders are not uniform throughout the state in that they do not place any curtailment on the production of oil in many oil fields therein, and in the prorated fields allows a larger percentage of potential production from some than from others.

The respondents have filed an answer in which they have denied generally the allegations of the petition; have asserted the validity of the statute under which the orders in question were made; that the orders were entered after the filing of an application therefor and the publication of notice as provided by section 7959, C. O. S. 1921, and the serving of personal notice upon all parties in interest, including the petitioner herein; the taking of testimony and conducting a full hearing at the time and place set therefor; that full findings of fact justifying the said orders were made and entered by the Commission; that the umpire and operators' committee were appointed with the consent of the Governor as provided by section 7958, C. O. S. 1921, and they further allege that the petitioner has never applied to the Corporation Commission for any modification of said orders, or either of them, nor sought any relief before the said Commission; that petitioner took no appeal from the said orders, or either of them, and they deny they have intended or threatened to take charge of petitioner's said property or operate his said well; they admit that their agents, the umpire and operators' committee, have demanded that petitioner comply with said orders, and admit that there is pending before said Commission contempt proceedings for alleged violation by petitioner of said orders, and allege that contempt proceedings are pending against more than fifty other operators in the state for alleged violations of said orders.

First let us consider the relief sought by petitioner and whether or not prohibition will lie.

It must be borne in mind that the relief here sought is the issuance of a writ of prohibition and it must therefore be further borne in mind that under numerous decisions of this court the writ will not issue unless it clearly appears that the Commission is wholly without jurisdiction or authority to do what it is attempting to do, or is attempting to make an unauthorized application of judicial force. Hirsh v. Twyford, 40 Okla. 220, 139 Pac. 313; State ex rel. Mayes v. Breckenridge, 43 Okla. 711, 142 Pac. 407; State v. District Court of Marshall Co., 46 Okla. 654, 149 Pac. 240; Baker v. Capshaw et al., 130 Okla. 86, 265 Pac. 115; Crews v. Bird, 141 Okla. 143, 285 Pac. 132. These authorities support the proposition as above stated and also hold that the writ of prohibition cannot be used as a substitute for an appeal.

It was further held in Jeter v. District Court of Tulsa County, 81 Okla. 3, 206 Pac. 831, that:

"Prohibition is an extraordinary writ and cannot be resorted to when the ordinary and usual remedies provided by law are available. It will only issue where an inferior tribunal does not have jurisdiction or assumes to exercise judicial power not granted by law, or is attempting to make an unauthorized application of judicial force."

Section 20 of article 9, Constitution of Oklahoma, provides:

"* * * All appeals from the Commission shall be to the Supreme Court only, and in all appeals to which the state is a party, it shall be represented by the Attorney General or his legally appointed representative. No court of this state (except the Supreme Court, by way of appeals as herein authorized) shall have jurisdiction to review, reverse, correct, or annul any action of the Commission within the scope of its authority, or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the Commission in the performance of its official duties; Provided, however, that the writs of mandamus and prohibition shall lie from the Supreme Court to the Commission in all cases where such writs, respectively, would lie to any inferior court or officers. * * *"

Under this provision, together with section 7960, C. O. S. 1921, an appeal lies to the Supreme Court from any order or action of the Corporation Commission, and no court of the state has jurisdiction to review, reverse, correct or annul any action of the Corporation Commission within the scope of its authority or to suspend or delay the execution or operation thereof or to enjoin, restrain, or interfere with the Commission in the performance of its official duties, save only this court on appeal, except that when the Commission acts outside the scope of its authority or assumes to exercise a power not granted to it or is attempting to make an unauthorized application of judicial

force, this court may restrain it by the issuance of the writ of prohibition.

It follows, therefore, that the questions presented here for our consideration and determination are, first, Is the Oil Conservation Law, being the Act of 1915, constitutional? and second, Are the acts of the Commission which are here sought to be prohibited within the scope of its authority? The consideration of this latter question also necessarily involves the further question of the reasonableness of the orders herein complained of and upon which petitioner lays much stress, both in oral argument and in the briefs filed herein.

Section 1 of the Oil Conservation Act, being section 7954, C. O. S. 1921, is as follows:

"That the production of crude oil or petroleum in the state of Oklahoma, in such manner and under such conditions as to constitute waste, is hereby prohibited."

Section 3, being section 7956. C. O. S. 1921, provides as follows:

"That the term 'waste' as used herein, in addition to its ordinary meaning, shall include economic waste, underground waste, surface waste, and waste incident to the production of crude oil or petroleum in excess of transportation or marketing facilities or reasonable market demands. The Corporation Commission shall have authority to make rules and regulations for the prevention of such waste, and for the protection of all fresh water strata, and oil and gas bearing strata, encountered in any well drilled for oil."

In the case of Quinton Relief Oil & Gas Co. v. Corporation Commission, 101 Okla. 164, 224 Pac. 156. this court held that the police powers of the state extend to the conservation of its natural resources.

In the case of Pawhuska Oil & Gas Co. v. City of Pawhuska, 47 Okla. 342, 148 Pac. 118. this court cited with approval Commonwealth v. Trent et al., 117 Ky. 34, 77 S. W. 390, 4 Ann. Cas. 209, and quoted therefrom as follows:

" * * * The Legislature may protect from waste the natural resources of the state, which are the common heritage of all. The right of the owner of property to do with it as he pleases is subject to the limitation that he must have due regard to the rights of others. To allow the storehouse of nature to be exhausted by the waste of the gas would be to deprive the state and its citizens of the many advantages incident to its use. That the Legislature may prevent this is well settled. Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729; State v. Ohio Oil Co.,

150 Ind. 21, 49 N. E. 809, 47 L. R. A. 627; Donahue on Petroleum & Gas, section 23."

In Rich v. Doneghey, 71 Okla. 204, 177 Pac. 86, in referring to the rights of a surface owner or a leaseholder, this court said:

"But with respect to such oil and gas, they had certain rights designated by the same courts as a qualified ownership thereof, but which may be more accurately stated as exclusive right * * * and the like, to erect structures on the surface of their land, and explore therefor by drilling wells through the underlying strata, and to take therefrom and reduce to possession, and thus acquire absolute title as personal property to such as might be found and obtained thereby."

It is so well settled that the police power of the state extends to the protection of its natural resources against waste that the citation of further authorities is, in our judgment, wholly unnecessary. The above quoted sections of the act which prohibit the waste of crude oil, define waste, and authorize the Corporation Commission to make rules and regulations for the prevention of such waste, come clearly within the police power of the state.

Petitioner contends that these provisions are too general and indefinite and that they are void for uncertainty. With this contention we cannot agree. The Commission is not left to define the meaning of the term "waste," even if that term alone should be considered as too general and indefinite. Section 7956 defines waste as including, in addition to its ordinary meaning, economic waste, underground waste, surface waste, and waste incident to the production of crude oil or petroleum in excess of transportation or marketing facilities or reasonable market demand. The word "waste" means to destroy wantonly, to diminish, to squander, to impair. Ordinarily, the term, when used in connection with the waste of crude oil, means to permit oil to be discharged or to flow out on the ground or be washed away and put to no useful purpose. Practically all surface losses of oil comes from the lack of proper storage and pipe line facilities and the inability of producers to control the flow of wells when they are first brought in under heavy pressures. It is a matter of common knowledge that serious surface wastage of oil results from putting it in earthern storage. These and other kinds of surface or ordinary waste are intended to be prevented by the act herein under consideration. "Underground waste" takes place whenever oil in the reservoir where it is discovered is left in the ground when it could, by proper operating methods, have been recovered.

We quote from amicus curiae brief filed on behalf of The Mid-Continent Oil & Gas Association and sundry producers, as follows:

" ' Underground waste' may not be so readily apparent to one not fairly conversant with the production of oil. It consists in so improperly finishing and equipping or inefficiently operating a well or wells in an oil field as to leave unrecoverable in the ground oil which otherwise could be extracted from the ground. It also may result from the flooding of the oil-bearing formation with salt water. Salt water is almost invariably present in the lower portion of the oil-containing formation, and whenever there is an extraction of the oil, this salt water, by reason of the pressure underground rises into the upper portions of the formation, and unless there is an efficient extraction of the oil through the wells, salt water can very readily, 'drown out' the oil by being permitted to accumulate about the bottom of the well in such a way as to shut off the oil at points away from the well and prevent its moving toward the well. Also, underground waste often results from a too rapid releasing through the oil wells of the gas pressure contained in the oil-containing formation. What is known as 'rock pressure' or 'gas pressure' is almost universally present in an oil-containing sand or lime formation, and if this pressure is too rapidly released through the wells, so that what is known as the 'gas energy,' not utilized to bring the oil out of the ground, it will result in leaving in the ground great quantities of unrecoverable oil, as well as in bringing to the bottom of the well much too rapidly the salt water which, in its original state, lay beneath the oil in the formation. See Oil, Its Conservation and Waste (Third Ed.) James H. Westcott; Function of Natural Gas in the Production of Oil (1929) by H. C. Miller, Senior Petroleum Engineer, U. S. Mines."

Another definition of waste, in section 7956 of the act is:

"Waste incident to the production of crude oil or petroleum in excess of transportation or marketing facilities or reasonable market demand."

Surface waste or underground waste, or both, may occur as an incident to the production of crude oil in excess of transportation or marketing facilities or reasonable market demand. It is readily apparent that if the production exceeds the market demand or transportation facilities, then the oil must be placed in storage, and if one producer produces in excess of such demand, then another must do likewise to prevent his oil from being drained, and so on with all the producers in the field, with the result that much oil would have to be placed in earthen storage and considerable oil would almost certainly be allowed to waste on the surface of the ground, to evaporate and to waste in streams and rivers. These several definitions of waste, all of which are prohibited by the act, are, in our judgment, definite and certain, and we so hold. In the case of Sears Roebuck & Co. v. Federal Trade Comm., 258 Fed. 307, 311, the U. S. Circuit Court of Appeals for the 7th Circuit had under consideration the question as to whether the words "unfair methods of competition" contained in section 5 of the Act of Congress creating the Federal Trade Commission, approved on September 26, 1914, reading as follows: "Unfair methods of competition in commerce are hereby declared unlawful," were too indefinite, and the court said:

"Petitioner urges that the declaration of section 5 must be held void for indefiniteness unless the words 'unfair methods of competition' be construed to embrace no more than acts which on September 26, 1914, when Congress spoke, were identifiable as acts of unfair trade then condemned by the common law as expressed in prior cases. But the phrase is no more indefinite than 'due process of law.' The general idea of that phrase as it appears in Constitution and statutes is quite well known; but we have never encountered what purported to be an all-embracing schedule or found a specific definition that would bar the continuing processes of judicial inclusion and exclusion based upon accumulating experience. If the expression 'unfair methods of competition' is too uncertain for use, then under the same condemnation would fall the innumerable statutes which predicate rights and prohibitions upon 'unsound mind,' 'undue influence,' 'unfaithfulness,' 'unfair use,' 'unfit for cultivation,' 'unreasonable rate,' 'unjust discrimination,' and the like."

The provisions for proportionate taking on the part of each producer in a common pool whenever the full production from the pool can only be obtained under conditions constituting waste, as defined in section 3, and which is prohibited by section 1, is found in section 4 of the act, which is as follows:

"That whenever the full production from any common source of supply of crude oil or petroleum in this state can only be obtained under conditions constituting waste as herein defined, then any person, firm, or corporation, having the right to drill into and produce oil from any such common source of supply, may take therefrom only such proportion of all crude oil and petroleum that may be produced therefrom, without waste, as the production of the well or wells of any such person, firm, or corporation, bears to the total production of such common

source of supply. The Corporation Commission is authorized to so regulate the taking of crude oil or petroleum from any or all such common sources of supply, within the state of Oklahoma as to prevent the inequitable or unfair taking, from a common source of supply, of such crude oil petroleum, by any person. firm, or corporation, and to prevent unreasonable discrimination in favor of any one such common source of supply as against another."

The first part of this section conforms to the rule announced by the Supreme Court of the United States in Ohio Oil Co. v. Indiana, 177 U. S. 190, 44 L. Ed. 729, and in Lindsley v. Natural Carbonic Co., 220 U. S. 61, 55 L. Ed. 369. Ann. Cases, 1912C. 160, the first of which this court cited with approval in Pawhuska Oil & Gas Co. v. City of Pawhuska, supra, and Rich v. Doneghey, supra. In the Lindsley Case the United States Supreme Court reaffirmed its holding in Ohio Oil Co. v. Indiana, supra, and stated that were the question an open one it would still solve it in the same way. Both of these cases have been frequently cited and followed. Notably in Oxford Oil Co. v. Atlantic Oil Co., 16 Fed. (2nd.) 639, same case on appeal, 22 Fed. (2nd.) 597; Nowata County Gas Co. v. Henry Oil Co.. 269 Fed. 742; Marrs v. City of Oxford, 24 Fed. (2nd.) 541, same case on appeal, 32 Fed. (2nd.) 138.

In sustaining the validity of a statute of Indiana which made it unlawful for any person, firm, or corporation having possession or control of any natural gas or oil wells to allow or permit the flow of gas or oil from such well to escape into the open air without being confined within such well or proper pipes or other receptacles for a period of two days next after the gas or oil shall have been struck in such well, the United States Supreme Court, in the Ohio Oil Co. Case, supra, said:

"It is also undoubted that such wells, when bored from many points in the superincumbent surface of the earth, are apt to reach the reservoir beneath. From this it must necessarily come to pass that the entire volume of gas and oil is in some measure liable to be decreased by the act of any one who. within the superficial area, bores wells from the surface and strikes the reservoir containing the oil and gas. And hence. of course, it is certain, if there can be no authority exerted by law to prevent the waste of the entire supply of gas and oil, or either, that the power which exists in every one who has the right to bore from the surface and tap the reservoir involves, in its ultimate conception, the unrestrained license to waste the entire contents of the reservoir by allowing the gas to be drawn off and to be dispersed in the atmospheric air, and by permitting the oil to flow without use or benefit to any one. These things being lawful, as they must be if the acts stated cannot be controlled by law, it follows. that no particular individual having a right to make borings can complain, and thus the entire product of oil and gas can be destroyed by any one of the surface owners."

The court further said:

"On the other hand, as to gas and oil, the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property. But there is a co-equal right in them all to take from a common source of supply, the two substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of the things, as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right, to the detriment of the others, or to waste by one or more, to the annihilation of the rights of the remainder. Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment by them of their privilege to reduce to possession, and to reach the like end by preventing waste."

In that case the court held that although the Ohio Oil Company could not produce its oil at a profit without producing and permitting the gas to waste into the air, for the rea son it had no market for the gas, the enforcement of the Indiana statute did not deprive said company of its property without due process of law. The principle upon which the first part of section 7957 is based, is found in the maxim, "Everyone must so use his own property as not to injure the rights of others," which was expressed by this court in Pawhuska Oil & Gas Co. v. City of Pawhuska, supra, when it stated that "The right of the owner of properties to do with it as he pleases is subject to the limitation that he must have due regard for the rights of others."

On account of the vagrant and fugitive nature of oil in the ground, it was clearly within the powers of the Legislature to protect "the co-equal rights" of all the owners of land in a common source of supply of crude oil in order to prevent any of such owners from taking from the pool more than his fair proportionate share of the

250 of 27250

oil and gas in pool, and it could reach such end by preventing waste.

In 6 R. C. L. "Constitutional Law," section 186, it is said:

"The police power to a large extent rests on the maxim. 'Sic utere tuo ut alienum non laedas,' and it is the function of the government by which this maxim is enforced. One of the objects of government is to impose that degree of restraint on individual action which is required for the reasonable enjoyment of all in their respective rights. It has been said that nearly every problem involved in the police power finds its solution in the application of the principle embodied in this maxim, that every one must so use his own property as not to injure the rights of others, and that this principle should be observed in the exercise of the police power."

The last, sentences of sections 7956, 7957, confer authority upon the Corporation Commission to make rules and regulations for the prevention of the prohibited waste and to so regulate the taking of crude oil or petroleum from any or all common sources of supply within the state as to prevent the inequitable or unfair taking from a common source of supply of crude oil or petroleum by any person, firm or corporation. This court has frequently and on numerous occasions upheld the authority of the Legislature to invest such power in the Corporation Commission. In the case of Quinton Relief Oil & Gas Co. v. Corporation Commission, supra, one question involved under the gas conservation statute, which is very similar in its provisions to the oil statute, was whether the Corporation Commission could be invested with power to determine whether the use of natural gas for the manufacture of carbon black was a "wasteful utilization" thereof, wasteful utilization being one of the definitions of waste as contained in the gas statute, and therein this court said:

"Counsel for petitioners insists that the Legislature has failed to define what constitutes wasteful utilization of gas, but has delegated to the Corporation Commission the power to determine that fact; and this constitutes an unlawful delegation of power, and renders the act unconstitutional."

The court then said:

"We are unable to concur in the contention of counsel for the petitioner that the Act of 1915 repeals section 4319, Revised Laws 1910 (sec. 7964, Comp. Stat. 1921), or that said Act of 1915 is unconstitutional by reason of the power delegated to the Corporation Commission for uncertainty in its provisions."

After mentioning the provisions of the acts there in question, the court said:

"This is a general term which vests the Corporation Commission with power to determine under a particular given state of facts whether or not the same constitutes a wasteful utilization of gas. It was within the constitutional power of the Legislature to vest the Corporation Commission with this jurisdiction."

At the conclusion of the opinion, the court said:

"It therefore is obvious that the state in the proper exercise of its police power and in conservation of so valuable a natural resource as natural gas, may prohibit the wasteful utilization of the same in the interests of the public welfare."

There is no limitation contained in the Constitution upon the power of the Legislature to vest the Corporation Commission with authority to act as an administrative agency of the state in the enforcement of laws enacted under the police power of the state.

In the case of Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531, 542, 58 Law Ed. 713, 718, the court, in passing upon the validity of an act of the Legislature of Pennsylvania which required the owners of coal mining property to leave or cause to be left a pillar of coal in each seam or vein of coal worked by them along the line of adjoining property of such width that taken in conjunction with the pillar to be left by the adjoining property owner would be a sufficient barrier for the safety of the employees of either mine in case the other should be abandoned, "such width of pillar to be determined by the engineers of adjoining property owners together with the inspector of the district in which the mine is situated," among other things, said:

"The Legislature has not defined with precision the width of the pillar, and it is very properly admitted that, in the nature of things, this would have been impossible, because the width necessary in each case must be determined with reference to the situation of the particular property. From this it necessarily results that it was competent for the Legislature to lay down a general rule, and then establish an administrative tribunal with authority to fix the precise width or thickness of pillar that will suit the necessities of the particular situation and constitute a compliance with the general rule. United States v. Grimaud, 220 U. S. 506, 517-522, 55 L. Ed. 563, 567-569, 31 Sup. Ct. Rep. 480. Administrative bodies with authority not essentially different are a recognized governmental institution. Commissions for the regulation of

public service corporations are a familiar instance. Interstate Commerce Commission v. Cincinnati, N. O. & T. R. Co. 167 U. S. 479, 495, 42 L. Ed. 243, 251, 17 Sup. Ct. Rep. 896. And it has become entirely settled that powers and discretion of this character may be delegated to administrative bodies, or even to a single individual. Re Kollock, 165 U. S. 526, 536, 41 L. Ed. 813, 17 Sup. Ct. Rep. 444; Wilson v. Eureka City, 173 U. S. 32, 43 L. Ed. 603, 19 Sup. Ct. Rep. 317; Gundling v. Chicago, 177 U. S. 183, 44 L. Ed. 725, 728, 20 Sup. Ct. Rep. 633; Fischer v. St. Louis, 194 U. S. 361, 371, 372, 48 L. Ed. 1018, 1023, 1024, 24 Sup. Ct. Rep. 673; Jacobson v. Massachusetts, 197 U. S. 11, 25, 49 L. Ed. 643, 649, 25 Sup. Ct. Rep. 358, 3 Ann. Cas. 765; New York ex rel. Lieberman v. Van De Carr, 199 U. S. 552, 560, 562, 50 L. Ed. 305, 310, 311, 26 Sup. Ct. Rep. 144."

The United States Circuit Court of Appeals for the 5th Circuit, in Oxford Oil Co. v. Atlantic Oil Producing Co., 22 Fed. (2nd.) 597, sustained the authority of the Legislature of Texas to invest the Railroad Commission of that state with power to make rules and regulations for the conservation of oil and gas and the protection of the rights of owners of adjoining lands, and sustained the validity of an order of the Railroad Commission relating to the drilling of wells within a certain distance of property lines, from which we quote as follows:

"It was within the power of the Legislature to lay down a general rule for the protection of the mineral rights of the owners of adjoining lands, and to leave the details of enforcing that rule to an administrative agency or board. Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531, 34 S. Ct. 359, 58 L. Ed. 713."

The concluding part of section 7957 authorizes the Corporation Commission to prevent unreasonable discrimination in favor of any one common source of supply as against another. What constitutes unreasonable discrimination depends upon the facts and circumstances and, as in Quinton Relief Oil & Gas Co. v. Corporation Comm., supra, this court held that the Commission had the power to determine whether the use of natural gas for the manufacture of carbon black was a wasteful utilization thereof, so here the Commission is vested with authority to determine the facts and ascertain what is not an unreasonable discrimination as between the several oil pools. This also gives the Commission power to classify the pools.

The rules which govern the determination of a classification in order that it may be sustained under the equal protection clause of the 14th Amendment to the Federal Constitution are well stated by the Supreme Court of the United States in the case of Lindsley v. Natural Carbonic Gas Co., supra, from which we quote as follows:

"The rules by which this contention must be tested, as is shown by repeated decisions of this court, are these: 1. The equal protection clause of the Fourteenth Amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. Bachtel v. Wilson, 204 U. S. 36, 41, 27 S. Ct. 243. 51 U. S. (L. Ed.) 357; Louisville, etc., R. Co. v. Melton, 218 U. S. 36, 30 S. Ct. 676, 54 L. Ed. 921; Ozan Lumber Co. v. Union County Nat. Bank, 207 U. S. 251, 256, 28 S. Ct. 89, 52 L. Ed. 195; Munn v. Illinois, 94 U. S. 113, 132, 24 L. Ed. 77; Henderson Bridge Co. v. Henderson, 173 U. S. 592, 615, 19 S. Ct. 553, 43 L. Ed. 823."

In the case at bar, counsel for the Commission have cited the cases of Bacon v. Walker, 204 U. S. 311, and Walls v. Midland Carbon Co., 254 U. S. 300, as cases bearing upon the question of the validity of the police regulations when attacked on the ground that they deny the equal protection of the laws. In Bacon v. Walker, the court had under consideration a law of the state of Idaho which prohibited the grazing of sheep within two miles of the residence of an owner of a claim. This statute was sustained as a valid exercise of the police power of the state although it did not apply to cattle or horses, but only to sheep. It was pointed out that sheep destroy vegetation and without the limitation imposed by this law the development of the state would be greatly retarded. In Walls v. Midland Carbon Co., the court had under consideration a statute of Wyoming, which prohibited the burning of natural gas for the manufacture of carbon black when the gas was produced from wells located within 10 miles of a city or town or industrial plant unless the heat contained in such gas was first used for domestic or industrial purposes. The court

upheld this statute as a valid exercise of the police power of the state and held that the fact that it was limited to gas produced from gas wells within 10 miles of a city or town or an industrial plant did not invalidate it under the equal protection clause, although gas from wells located outside of the 10 mile limit might be used for such purpose without the heat contained therein being used for industrial or domestic purposes. This court cited the Walls Case with approval in Quinton Relief Oil & Gas Co. v. Corporation Commission, supra. If a classification of the several common sources of supply of crude oil which the Commission makes in its order or orders for the prevention of unreasonable discrimination between common sources of supply has any reasonable basis and is not purely arbitrary, then this court cannot, on a petition for a writ of prohibition, hold it is void.

We are forced to the conclusion, and so hold, that the sections of law herein under consideration and hereinbefore quoted (excluding section 7955 not involved herein and upon which we are not called upon to pass) are constitutional; that the delegation of authority to the Corporation Commission is lawful, and that the Commission may lawfully make rules and regulations to prevent the waste of crude oil and to protect the co-equal rights of the owners of land in a common pool to take proportionately from the pool and that the Commission may prevent unreasonable discrimination between pools.

Petitioner very vigorously contends that even though this be true, which it does not concede, the orders made by the Commission are unreasonable and that the attempt of the Commission to enforce same amounts to an unauthorized application of judicial force and should therefore be prohibited by this court.

The Commission found as a fact that the commission of waste was imminent and that rules and regulations were necessary to prevent it; that the market demand in the flush and semi-flush pools was far below the potential production of the wells in those pools and that unless the production was curtailed waste would result; that the demand for oil from said pools was not the same; that in order to prevent waste a different percentage of production was necessary in some of said pools than in others because of variations in the demand and it ordered curtailment of production in said pools and fixed the percentage for each. It expressly required proportionality of taking from the wells by the producers in each of the prorated pools. In so doing it is en-

forcing the provisions of the first part of section 7957. In the Oklahoma City pool new wells of large capacity have been coming in almost daily, thus increasing the potential production of that field, but the market demand has not kept pace with the production or potential production. This condition, it seems, has been the cause of the lowering of the percentage in that field from 16 2/3 per cent. found by the Commission order of June 30, 1930, to correspond to the then existing demand.

The Commission foresaw the possibility of having to change the Oklahoma City field percentage and took care of it in its order, for, as is well known, that field is under the most intensive development of any field in the state. But, contemplating the possibility of an increase in the demand in that field, the Commission in its order said "The Corporation Commission finds that the output from the Oklahoma City pool should be limited to the reasonable market demand from said pool, which at the present time is about 16 2/3 per cent. of the potential production, but which may increase to as much as 25 per cent. of the potential production from said Oklahoma City area, and that therefore, the maximum permitted production should be left at 25 per cent. of the potential as in existing order," etc. Later. because of the increase in the potential, the Commission lowered the percentage for this field to 8⅓ per cent. It is clear therefore that the Commission had some basis for its decision and whether, on an appeal from its order, this court upon reviewing the evidence, would have arrived at a different conclusion is not before us in this proceeding for a writ of prohibition.

The orders set forth in considerable detail the reasons for the percentages in the different curtailed pools and it cannot be said from the record before us that there is no reasonable basis for them, and it necessarily follows that it cannot be said that the orders are not valid. Lindsley v. Natural Carbonic Gas Co., supra.

As to the uncurtailed fields in the state, the Commission finds that they are old fields with settled production and an adequate market outlet. and that to leave them unprorated will not result in waste; and it finds that in most of them the wells are very small and it points out certain harmful results from curtailing such very small wells. We are unable to say there is no reasonable basis for this decision nor that under the circumstances it results in any unreasonable discrimination in favor of the old pools.

Petitioner alleges that it is not wasting

any of its own oil, and that it has expended large sums of money in the work of producing, transporting, and preparing to refine the oil it has produced and expects to produce from its wells. In other words, petitioner contends that it will be able to handle in its own refinery the production from its wells, and it places great stress on its contention that the orders of the Commission of which it here complains unconstitutionally interfere with its alleged right to operate its wells to full capacity, transport the oil therefrom to its own refinery, and refine it into gasoline and other products for disposition in the ordinary conduct of its business. The authorities cited by petitioner on this question do not, in our judgment, support this contention, but the contrary view is sustained by other authorities hereinbefore cited and quoted from. Ohio Oil Co. v. Indiana, supra. As has been shown, the state may, in order to prevent waste, limit the production of oil from any well. This is true whether the owner of such well has his own market outlet or not; and, as has already been shown, the state has the power to protect all the collective owners in a common pool against the disproportionate taking by any one or more of said owners. Since, unquestionably, the power of the state extends to requiring proportionality of taking by all the owners in any pool where the production from the pool cannot be obtained without waste, it extends also to limiting the taking of only their proportionate parts of the common fund by those producers who possess their own pipe lines or refineries or other means of disposing of the full amount of the potential production of their wells. Certainly not all the owners in the Oklahoma City pool have outlets for their full potential production, else there would be a market outlet for the full production of the field, and no need for any curtailment. A limited few, one or more large producers, and one or more small producers, may have such outlet, but if they be allowed to produce without limit, then the oil of the remainder will be drained and appropriated by these fortunate ones, or such remaining well owners will have to produce and store, many of them in earthen tanks, their oil, and thus great waste will result. A law which prohibits these things is valid. It does not unconstitutionally interfere with the rights of one in the situation of petitioner. He may not indirectly cause waste to occur nor may he deprive others of their fair share of the oil in the common pool.

Petitioner also contends that the purpose of the orders in question is to control the price of crude oil. When the production exceeds the market demand the price is very apt to drop, and when it is held within the market demand, the tendency is to stabilize the price. The enforcement of the Conservation Act and of these orders may have some influence on the price, but if so, same is merely incidental and not the primary purpose thereof. One of the purposes and functions of government is to promote the general prosperity of the country wherever possible, and if this result flows incidentally from the enforcement of this act, same will not be stricken down because of that fact. This is only another element of the broad functions of the police power. See Ex parte Tindall, 102 Okla. 192, 229 Pac. 125, and Bacon v. Walker, 204 U. S. 311. However, as hereinbefore suggested, this law is intended to prevent waste and to protect the co-equal rights of the landowners in the pools when the full production cannot be obtained without waste, and it applies at all times regardless of the price of oil or its effect on the price. While the public is largely interested in and affected by the oil industry, the industry is not impressed with a public interest like public service companies, but the state is, as it should be, interested in the prevention of the waste of its natural resources. And, if as an incident of this prevention, the laborers and smaller, as well as larger, producers of oil and those who sell goods and loan money to those engaged in the oil business are kept out of financial distress, then that result is commendable and cannot permit any basis for an objection to the law, if otherwise valid.

Petitioner further contends that the umpire and operators committee have been authorized to perform legislative duties, but, from a careful examination of the orders, we find that this committee and the umpire act only in an administrative capacity in enforcing the orders. They report to the Commission for approval any changes in percentages which the market outlet may require. It is merely a matter of mathematical calculation to determine how this market outlet compares to the potential production and to determine what the percentage in any case is, but final action thereon is taken by the Commission.

Vigorous complaint is made as to that part of the order requiring newly completed wells to be shut in for 65 days, except for one day of open flow for test thereof, before being allowed to produce under the proration plan. The order is one of a series of proration orders which have been entered from time to time, each being limited to about three months ahead. The drilling of new wells has not been retarded by

any orders of the Commission, but the Commission found it was reasonable and proper to require new wells to be shut down for a while in order to establish equality between them and older prorated wells, which had suffered a great deal of shut down time. In the brief of the Mid-Continent Oil & Gas Associaton, hereinbefore referred to, we find this statement:

"An examination of the orders of the Commission will show that all other wells in the Oklahoma City pool were treated similarly; that in other pools aside from the Oklahoma City pool a certain amount of shut down time was imposed and that the reason for thus requiring new wells to refrain from production for a stated length of time was to establish an equality between existing wells which had previously been compelled to shut down and the new wells which might come in thereafter."

An examination of the orders discloses that this statement is correct. We are therefore unable to say that there is no reasonable basis for this part of the order, or that it is purely arbitrary. It appears on its face to be fair, and the response alleges that it was agreed to by the operators in the field. We assume that the operators would not have agreed to it if it was apt to ruin the wells or did not appear to them to be reasonable.

Petitioner contends that it had no notice of the proceedings before the Commission. The response shows that there was notice by publication to all persons and classes interested, and personal service of notice on petitioner and others. Service by publication is not denied, but as to personal service, petitioner contends that the persons served were not its agents. An affidavit has been filed showing that they were employed by petitioner and we are satisfied that petitioner had actual knowledge of the proceedings as they were carried on. It had the right under section 7959 to file an application before the Commission at any time and seek a modification of the order, if unreasonable or if conditions changed, and to be heard, and, if aggrieved at the decision of the Commission, could appeal to this court under section 7960. Likewise, it could have appealed from the original order, had it so desired.

Petitioner further says that the title of the 1915 Law embraces more than one subject and its contents are not expressed in the title. Under the law as announced by this court in Oklahoma Light & Power Company v. Corporation Commission, 96 Okla. 19, 220 Pac. 54; Carr v. State, 25 Okla. Cr. 289, 220 Pac. 479; Griffin v. Thomas, 86 Okla. 70, 206 Pac. 604, and Jackson v. State, 22 Okla. Cr. 338, 211 Pac. 1066, this contention is without merit. The act deals with the prevention of the waste of crude oil, the equitable taking of same from the ground, conferring authority on the Commission and prescribing penalties for violation of the act. These cover but one general subject, though there are several details. The inhibition is against two or more unconnected subjects being embraced in the act, and such is not the case here, as we view it.

The orders of the Commission do not interfere with interstate commerce as petitioner contends. They deal with the production of oil from the ground and its waste. One method of enforcing the order is to forbid carriers from taking oil produced in violation of the orders. This, as shown by the order of June 30th, was to prevent purchasers and transporters from aiding and abetting producers in violating the order so that neither producer nor transporter could disrupt the plan and thus bring about the commission of waste. The effect, if any, on interstate commerce is purely incidental and remote.

In Field v. Barber Asphalt Paving Co., 194 U. S. 618, 623, 48 L. Ed. 1142, 1154, the court said:

"The right of a state, in the exercise of the police power, to make regulations which indirectly affect interstate commerce, has been frequently sustained."

Also, it does not appear that petitioner desires to ship oil from its well in interstate commerce, and it is therefore not in a position to raise this point here. Pioneer T. & T. Co. v. State, 40 Okla. 417, 138 Pac. 1033; Insurance Co. v. Welch, 49 Okla. 620, 154 Pac. 48.

It appears from the order of June 30, 1930, that all the operators, save one, agreed to it and petitioner contends that the orders were made because some producers agreed to have them made, and that they therefore do not, in fact, represent the judgment of the Commission. But it also appears that the Commission received an application to make the orders, it gave notice to all concerned, set a time and place for its hearing; heard evidence and made rather extended and elaborate findings of fact based on the evidence and entered its orders accordingly. The fact that practically all the operators agreed is no objection to the validity of the orders, but may be considered as a circumstance in favor of their reasonableness. See Gorieb v. Fox, 274 U. S. 603, 71 Law Ed. 1228, and Miller v. Schoene, 276 U. S. 272, 72 Law Ed. 568.

It is shown by the response that some 60 operators are now cited by the Commission for contempt for violations of these orders. The Commission has the power, and it is its duty, to punish for contempt any intentional or willful violations of its orders, from which the right of appeal lies to this court.

If discrimination has occurred or errors or mistakes as to facts or of judgment on the part of the Commission or its agents in the administration of this law have been made, which is very likely true, same can afford no basis for declaring the law invalid, proper and adequate methods being provided for the correction of same.

In the early case of Anderson v. Ritterbusch, Treas., 22 Okla. 761, 98 Pac. 1002, in an opinion by Justice Kane this court said:

"It may be that Senate Bill No. 245 is not as complete a piece of legislation as possible, but we believe it is adequate for the purposes for which it was enacted, and infringes no vested rights of the persons affected by it. That it may be capable of improvement is a matter with which we have nothing to do. That is with the Legislature. 'Judges ought to remember that their office is jus dicere, and not jus dare—to interpret law, and not to make law, or give law.' The rule laid down by Mr. Chief Justice Marshall in Fletcher v. Peck, 6 Cranch, 87-128, 3 L. Ed. 162, is sound and salutary;

" 'The question whether a law be void for its repugnancy to the Constitution is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. * * * But it is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other'."

It may be that the 1915 Act could be improved upon in some respects, but the matter of its alteration or improvement or repeal by the Legislature is one with which we have nothing to do, since our function is exclusively to interpret law, not to make law.

The question here is, as in all cases involving the constitutionality of an act of the Legislature, not whether it is a good or bad law, but only whether the Legislature, representing one of the three co-ordinate branches of the state government, to. wit, the legislative, acted within its powers as prescribed and limited by the Constitution in passing same.

The rule was early announced in this jurisdiction in City of Pond Creek v. Haskell, 21 Okla. 711, 97 Pac. 338, in a very exhaustive opinion by Justice Dunn, and has consistently been followed since that time. The first paragraph of the syllabus of that opinion is as follows:

"A court will never declare an act of legislation, passed with all the forms and solemnities requisite to give it the force of law, unconstitutional and void, unless the nullity and invalidity of the act are placed, in its judgment, beyond a reasonable doubt."

We have carried comment and citations further than we otherwise would because of the vigorous insistence of counsel that the act in question was vulnerable to their attack on the constitutional grounds discussed and because of the questions presented. We feel, however, that the importance of this matter is ample justification for our rather extended discussion of same.

From a careful review of the act in question, the orders of the Commission, and the authorities cited, we are clearly of the opinion that the sections of the act here in question are not repugnant to the Constitution of this state nor to the federal Constitution, and we are unable to say from the record before us in this proceeding that the orders of the Commission are unreasonable, and it therefore follows that the writ of prohibition must be, and the same is hereby, denied.

---

LESTER, V. C. J. In my judgment the Legislature is empowered with the right to pass laws having for their object the conservation of the natural resources of this state. Oil is one of the natural resources thereof. Conservation statutes must not become the vehicle of monopoly of supply or of prices.

The action of the Corporation Commission directing the shutting down of an oil well or a group of oil wells must be based upon evidence that production beyond the immediate demand and consumption would create a waste in bringing the oil to the surface by producing evaporation, leakage, and other causes.

I think the act of the Legislature, so far as it attempts to properly conserve the oil of the state, is constitutional, and that the orders of the Corporation Commission herein attacked, if erroneous, are subject to appeal from the Corporation Commission to this court.

This court has uniformly held that the writ of prohibition cannot be substituted for an appeal. The writ should be denied.

RILEY, J. (dissenting). Two important questions are presented in the case at bar. The first, which I consider, is a matter of procedure. Should petitioner be permitted to dismiss his action? It is my view that this court's order denying petitioner's motion to dismiss is in excess of authority and an abuse of discretion.

2 R. C. L. 144, states the rule, par. 144:

"According to the great weight of authority an appellant or plaintiff in error may dismiss his appeal or writ of error without regard to the consent of the appellee or defendant in error.* * * The appellant has even been allowed to dismiss his appeal after the delivery of its opinion by the appellate court, but before judgment was rendered."

Dismissal, whether in original action or in appeal, is governed by the same general principle. It signifies the ending of a suit (18 C. J. 1145) ; it is in fact a nonsuit. While it is a true rule that a petitioner has no absolute right at all times and under all circumstances to dismiss—for such right is dependent upon the effect it has on the rights of the respondent—and in this regard the matter of dismissal rests within the discretion of the court, but subject to the restriction as affecting the movant's adversary. The movant cannot be compelled to prosecute the action against his will. Valentine v. Valentine, 119 N. Y. S. 426. 18 C. J. 1148:

"But, ordinarily, he has the legal right, which in some cases is said to amount to an absolute right to discontinue or dismiss his suit upon such terms and under such conditions as he sees fit, or upon such terms as the court may impose, and his reasons for so doing are of no concern to the court."

Nebraska so holds in Banks v. Uhl, 6 Neb. 145, under the view that a plaintiff is entitled to dismiss an action voluntarily without prejudice to another action, although his object in procuring dismissal is to enable him to proceed with another action concerning the same subject-matter.

Herein there can be no substantial ill effect upon the adverse party by permitting petitioner to dismiss, for proration will continue, the law will be presumed to be constitutional, and in fact the only gain to the adversary and all that can be hoped for by a decision of this subject-matter is a favorable judicial determination of the constitutionality of the statute, which seems to be a question about which they are very qualmy and in doubt.

"Under ordinary circumstances," says Corpus Juris, "it is almost a matter of course to grant a dismissal or nonsuit, before verdict, upon payment of costs." Veazie v. Waldleigh, 11 Pet. (U. S.) 55, 9 L. Ed. 630. Herein cost was paid in advance.

Section 664, O. O. S. 1921, provides that an action may be dismissed by plaintiff before final submission of the case.

In New H. Baking Co. v. Ball, 57 Kan. 812, 48 Pac. 137, it was held that the right to dismiss without prejudice before final submission is absolute and the denial of an application so to do is prejudicial error. Our statute is identical with that of Kansas. There it was said:

"The plaintiff is entitled to control the disposition of the action, where the application is seasonably made, and until the final submission of the cause. It was a common law right and in this state the statute expressly provides that the plaintiff may dismiss without prejudice to a future action before final submission of the case to the jury, or to the court, where the trial is by the court. * * * Until that time the right is absolute, to be exercised by the plaintiff at its option and without the consent of the defendants."

In Pugsley v. C., R. I. & P. Ry. Co., 69 Kan. 599, 77 Pac. 579, when the court was giving reasons for sustaining a demurrer to plaintiff's evidence, the plaintiff dismissed his action.

Of course safeguards protect a plaintiff where a dismissal is secured by fraud (Harjo v. Black, 49 Okla. 566, 153 Pac. 1137; Mullen v. Noah, 64 Okla. 181, 166 Pac. 742), or in the event plaintiff is of unsound mind. 2 R. C. L. 168, par. 144.

What constitutes final submission in this case? My view is that the cause is not closed until the physical handing down of decision on the merits, which as yet has not occurred. "Final submission" is not made until all questions of law have been disposed of by the court, says the Kentucky court. Doss v. Ill. Cent. R. Co., 198 Ky. 222, 249 S. W. 346. "Final submission" means a submission which is equivalent of the return of the verdict, says the court of Montana. Samuel v. Montana H. Col. Co., 69 Mont. 111, 220 Pac. 1093.

In Avery v. Jayhawker Gasoline Co., 101 Okla. 286 , 225 Pac. 544, the provisions of section 664, supra, were construed in accord herewith, and in Naylor v. Eastman Natl. Bk., 107 Okla. 208, 232 Pac. 73, this court held that a "plaintiff may, without leave of court, dismiss before final submission to jury **or rendition of judgment** by filing signed statement," by virtue of section 665, C. O. S.

1921. We there held: "Section 665, C. O. S. 1921, grants unto. a plaintiff a right of dismissal in addition to the right given him by section 664," and that

"It is not necessary to determine here whether the submission to the court of defendant's motion for judgment upon the pleadings was such 'final submission of the case' as bars the plaintiff from their dismissing of his action under section 665, supra. This is true because under section 665, supra, the plaintiff may so dismiss upon payment of cost at any time before his adversary has filed a pleading in the action asking affirmative relief. He may in the absence of such pleading, therefore, do so until the case has been terminated by the judgment of the court, if the same has not been finally submitted to a jury."

Such is the situation before this court, there is no pleading for affirmative relief by respondents, the costs are paid, the petitioner has filed his written and signed statement that he does so dismiss and under the adjudicated cases as recited in the Naylor Case, therefore, "Such dismissal is immediately effective without any order of dismissal being made by the court." Consequently I hold that under the decided cases we have no authority to deny dismissal as herein presented. But, if I be wrong in that conclusion, I maintain that this court abused its discretion by the order as made.

The statement attached to petitioner's motion to dismiss mentioned in the supplemental opinion set out the following:

"In view of the opinion of the federal court that before invoking an extraordinary remedy a party should first exhaust his remedy before the Corporation Commission, we have decided to dismiss the action in the Supreme Court. While we may obtain no relief whatsoever before the Corporation Commission, yet if this preliminary step be necessary, we will take it as we expect to comply with all the law."

The petitioner contends its federal rights are involved in the subject of the litigation. No doubt it desires to appeal eventually to the Supreme Court of the United States. Here the federal court, concerning this very subject-matter, has advised, according to the statement, that there should be an exhaustion of remedy by application to the Corporation Commission. Petitioner seeks to so proceed, the better to protect his rights, the better to present his case, not only for the benefit of this court, but also in view of appeal to the federal court from any adverse decision of this court, yet we by our order deny petitioner what I consider his absolute right under our adjudicated cases.

At any rate it is an abuse of discretion to render such judgment as will conclude the parties to the action.

"In a case of doubtful solution, involving a question of conflict between a statute of the state and of the United States, this court will so decide as that the judgment may come in review before the highest judicial tribunal, the Supreme Court of the United States, without the expression of their own opinion, which might conclude the party." Hopkins v. Stockton, 2 Watts & Sergeant (Pa.) 163.

The plain wording of the statute is:

"A plaintiff may, on the payment of costs, and without an order of court, dismiss any civil action brought by him at any time before a petition of intervention or answer praying for affirmative relief against him is filed in the action." Section 665.

No petition of intervention or answer praying for affirmative relief is filed in this cause.

By a long line of decisions the statute, supra, has heretofore meant exactly what it says. Davis v. Mimey, 60 Okla. 244, 159 Pac. 1112; Okla. Coal Co. v. Corrigan, 67 Okla. 90, 168 Pac. 1024; Stuart v. Hicks, 52 Okla. 665, 153 Pac. 143, and two early cases cited therein; Mullen v. Noah, supra; Interstate Crude Oil Co. v. Young, 29 Okla. 465, 118 Pac. 257; Long v. Bagwell, 38 Okla. 312, 133 Pac. 50; Kolp v. Parsons, 50 Okla. 372, 150 Pac. 1043; Brown v. Massey, 19 Okla. 482, 92 Pac. 246; Oberlander et al. v. Confrey, 38 Kan. 462, 17 Pac. 88; McIntosh v. Lynch, 78 Okla. 85, 188 Pac. 1079.

From a consideration of cases relied upon by the supplemental opinion it is obvious the only one of the two cited from this jurisdiction touching dismissal on motion of plaintiff is Taylor v. Green, 119 Okla. 297, 249 Pac. 393. The other cases quoted from deal with situations and cases where the subject-matter has become moot. The Taylor Case construes only section 664. It does not deal with section 665, and concerns a matter adversely affecting the substantial rights of movant's adversary in clouding his title to real estate.

In the Dove Case, 114 Okla. 144, 244 Pac. 798, there was no motion on the part of any one to dismiss. The only question considered in the connection here was whether the matter should be decided at all, since the subject-matter involved had become moot, and upon the subject of academic or moot questions the cases: Memphis St. Ry. Co. v. Rapid Transit Co. (Tenn.) 179 S. W. 635; State ex rel. R. R. Com'rs v. Southern Tel.

& Const. Co., 65 Fla. 67; In re Fairchild (N. Y.) 45 N. E. 943; Commonwealth of Mass. v. Klaus,130 N. Y. S. 713; Giles v. Harris, 189 U. S. 484—all upon the moot question, were cited in the opinion by Mr. Justice Harrison and concern only that question. They constitute no logical basis for the supplemental opinion, for there is no motion by plaintiff to dismiss the actions in any of them.

It is my firm and fixed opinion that the Supreme Court should itself stand for regularity of procedure as above all other things.

My next protest goes to the decision of the majority on the subject-matter of the cause presented. Therein is presented the paramount issue as to whether the state in the exercise of its police power can anticipate waste of petroleum, when no actual physical waste occurs, build about such conjecture a scheme of proration so as to deprive or restrict a private person or private business in the enjoyment and use of valuable property rights; this in an effort to control the economic law of supply and demand by preventing overproduction of crude oil, and thus afford protection to an industry. I hold not. I would analyze the proposition stated and solve the issue before us in the following manner:

1. The Constitution of this state does not warrant the orders made, but the exercise of such powers by the Corporation Commission in the making and execution of such orders as presented is contrary to the express provisions of the Constitution.

(a) The majority opinion falls into error when it concludes and holds that article 9 of the Constitution authorized the proceedings of the Corporation Commission resulting in the orders of proration, or the delegation of that power by the Legislature to the Corporation Commission under chapter 25, S. L. 1915.

(b) The power and authority of this state to conserve natural resources by preventing actual present waste thereof flows solely from the police power of the state.

2. "Economic waste" and "waste in excess of market demands" as used in the orders of proration presented, and as used in the statute (chapter 25, S. L. 1915) purporting to be authority for the orders, is fictitious, anticipatory and in contemplation of sale in the marts of trade. These words deal with value and price standards. The defined object word of the act "waste" eliminates private, lawful use of petroleum such as that to which the petitioner herein seeks to put his property. Herein the petitioner seeks to use its own petroleum in its own refinery, where it commits no waste as the word is defined in dictionaries and commonly understood.

3. Price fixing is evidenced by section 2 of the act (chapter 25, S. L. 1915), and that section is admittedly unconstitutional by proponents in their briefs and so held unconstitutional by the majority opinion, wherein it is said that it cannot be assumed that we would sustain that section were it presented to us, for: (a) The presumption is that a law is constitutional. Since it cannot be assumed that if that section were before us we would sustain it, the result is that section 2 is held to be unconstitutional. (b) Section 2 being unconstitutional as a price fixing statute, the other provisions of the act are unconstitutional unless they are severable. They are not so severable because all sections are dependent upon the definition of the word "waste," which definition by the terms of the act, as disclosed by section 3 thereof, is extended beyond the ordinary meaning and common acceptation, and provides that the same "shall include **economic waste** * * * and waste * * * in excess of transportation or marketing facilities or **reasonable market demands.**" Which phrase denotes the true object of the whole act not to be conservation of the natural resources, but a mere subterfuge by which control of prices is sought to be reached through an arbitrary and unreasonable infringement on property rights in an effort to influence the economic law of supply and demand. (c) "Protection of the industry" is shown in the briefs of proponent to be the true object of proration and not protection of the public in its enjoyment of natural resources through true conservation.

4. All provisions of the act are unconstitutional with the possible exception of section 1, which simply prohibits waste in its common meaning, and since fictitious and anticipated waste as defined must be eliminated, there remains two subjects embraced in the act as reflected in the title, foreign to each other and in contravention of section 57, art. 5, Constitution, ordaining that "every Act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title," which provision has been held by this court to be mandatory.

(a) The two subjects as contained in the act, supra, are: First, the definition and prohibition of waste of crude oil. Its background is a valid application of police

power when applied to the prohibition of actual waste of natural resources. The second is provision for the equitable taking of crude oil from a common source. It is the declaration of a new public policy in lieu of existing public policy evidenced by a long line of judicial decisions wherein it is held that ownership of oil and gas becomes fixed only when reduced to possession based upon the principle that oil and gas like wild animals is "a sort of subterranean ferae naturae" and belongs only to him who reduces same to possession. In Re I. T. I. O. Co., 43 Okla. 307, 142 Pac. 997; Rich v. Doneghey, 71 Okla. 204, 177 Pac. 86. The second subject-matter has to do with a private right or obligation attaching to a property or contract. It is judicial in character and not sufficiently correlated to the former as to be incidental. In re County Commissioners, 22 Okla. 435, 98 Pac. 557.

5. The respondent Corporation Commission herein pleads that in the promulgation of the orders of proration it was exercising "legislative power." There is no authority for the exercise of legislative power by the Corporation Commission except that provided by article 9 of the Constitution, which article deals solely with transportation and transmission companies and public service corporations, but not with private business or enterprises such as that of producing oil.

I have thus endeavored to merely outline my view upon this novel question. I shall now consider some of my objections to the majority opinion.

Cooley on Constitutional Limitations is relied upon and quoted from in a paragraph enclosed by parenthesis, p. 1319. A more applicable citation is contained on p. 1228, vol. 2 (8th Ed.) in reference to police power:

"But the power is subject to limitations imposed by the federal and state Constitutions upon every power of government, and it will not be suffered to invade or impair the fundamental liberties of the citizen"

—as well as notes thereto. As stated in State v. Ashbrook, 154 Mo. 375, 48 L. R. A. 265, "If no such object," it says in reference to prevention of some offense or manifest evil or preservation of public health, morals, safety or welfare, "is discernible, but the mere guise and masquerade of public control under the name of 'an act to regulate business and trade,' etc., is adopted, that the liberty and property rights of the citizens may be invaded, the courts will strike down the act as unwarranted. Mere

legislative assumption of the right to direct and indicate the channel and course into which the private energies of the citizens shall flow, or the attempt to abridge or hamper his rights to pursue any lawful calling or avocation which he may choose without unreasonable regulation or molestation have ever been condemned in all free government." Chicago v. Netcher (Ill.) 48 L. R. A. 261; People ex rel. v. Coolidge (Mich.) 50 L. R. A. 493; Jackson v. Mass., 197 U. S. 11.

And likewise the following:

"A law which assumes to be a police regulation, but deprives the citizen of the use of his property under the pretense of preserving the public health, safety, comfort or welfare, when it is manifest that such is not the real object and purpose of the regulation, will be set aside as a clear and direct invasion of the right of property without any compensating advantages." Spann v. Dallas, 111 Tex. 350, 19 A. L. R. 1387.

And:

"The police power is not unlimited." Goldman v. Crowther, 147 Md. 282, 38 A. L. R. 1455.

As well as:

"Police regulations cannot be purely arbitrary nor purely for the promotion of private interests." State v. Chicago, M. & St. P. R. Co., 68 Minn. 381, 38 L. R. A. 672; Janesville v. Carpenter, 77 Wis. 288, 8 L. R. A. 808; Gaines & Co. v. Holmes, 154 Ga. 344, 27 A. L. R. 98.

And on page 1232 of the text:

"Neither the police power itself, nor the discretion to exercise it as need may require, can be bargained away by the state."

Here the Corporation Commission specifically pleaded that in the promulgation of the orders of proration it was exercising legislative power. It has no such power except in rate making cases, which exists by virtue of the provisions of article 9, supra, when dealing with transportation, transmission and "business clothed with a public nature" such as a "public service enterprise." But when the Corporation Commission makes rules and regulations restricting the use of private property as here, it is, as it pleads, exercising legislative power, but in my judgment so doing without sanction of constitutional authority, for that power is by section 1, art. 4, and sec. 1, art. 5 (with specific exceptions, such as the right of the public to initiate a measure and the right of the Corporation Commission to deal with public service enterprises) limited to the Legislature.

Article 9, Constitution, does not provide for

the extension of legislative power to the Corporation Commission as applied to a private enterprise or business. Section 19 thereof limits the conferring of additional power and imposition of additional duties to subject-matters "not inconsistent with this Constitution" and 'in connection with the visitation, regulation or control of corporations or with the prescribing and enforcing of rates and charges to be observed in the conduct of any business **where the state has the right to prescribe rates and charges in connection therewith or with the assessment of the property of corporations or the appraisement of their franchises for taxation,**" etc. None of which provisions have anything to do with a private business enterprise such as that of an oil producer.

The Tindall Case cited in the majority opinion dealt with a common carrier for hire, a motor bus, and as therein stated it was a **"public service business** operating over public highways" and therein it was held: "Sections 18 and 19 of art. 9, Constitution, specifically confer upon the Corporation Commission authority to supervise, regulate and control 'public service corporations'." The majority opinion falls into error when it holds article 9 of the Constitution authorizes such power as exercised by the Corporation Commission.

The Tindall Case, supra, said:

"Bearing in mind that the business of petitioner is that of a 'transportation company' for hire, and therefore a 'public service enterprise,' and subject to state control, keeping in mind, also, that the state may exercise control over the public highways, * * * there is no merit in the contention that the state within the sphere of its police power cannot exercise a reasonable control over such business."

Which was tantamount to saying: Since the business is clothed with a public nature, control of which is specifically vested by the Constitution, article 9, in the Corporation Commission, the contention that there is no control by virtue of the police power is unworthy of consideration, however, such a business may be so controlled under the police power.

Since police power is the sole source of authority warranting the act under which the proration orders are made, it is my opinion that, while the legislative branch of government could exercise such power so as to prevent a physical waste of natural resources, it is without authority to delegate such legislative power to an administrative agency such as the Corporation Commission.

"The Corporation Commission, as created by article 9 of the Constitution, is a body, with, so far as the regulation of **public service corporations** is concerned, executive, judicial and legislative powers, but those powers are limited, and it has such jurisdiction and authority only as is expressly or by necessary implication conferred upon it." Smith v. Corp. Comm., 101 Okla. 254, 225 Pac. 708; A., T. & S. F. Ry. Co. v. Corp. Comm., 68 Okla. 1, 170 Pac. 1156; Okla. City v. Corp. Comm., 80 Okla. 194, 195 Pac. 498.

The power to restrict, regulate or control is a legislative function. The promulgation of a rule by which an oil well belonging to private individuals is allowed to produce only 8⅓ per cent. of its potential is a legislative act, as is the rule ordaining that use of such property shall be restricted to 12 days out of 100.

Section 1, art. 4, Constitution, enumerates the three departments of government, declares they shall be separate and distinct and inhibits the exercise of the powers belonging to any one by the other, except as provided in the Constitution. In re County Comm., 22 Okla. 435, 98 Pac. 557; Williams v. City of Norman, 85 Okla. 230, 205 Pac. 144.

Chief Justice Williams in the first cited case quoted from Smith v. Strother, 68 Cal. 194, 8 Pac. 852, pointing out that a legislative act establishes a rule regulating and governing in matters or transactions occurring after its passage and defining rights and wrongs by a rule laid down. Such are the orders in the case at bar. It was there remarked that the distribution of powers of government into the three separate departments is the basic principle of our constitutional system. How important is that principle of our government when we view the intricate problems dealt with in this age of regulation and control as distinguished from the ancient principle embodied in the phrase "competition is the life of trade," and Jefferson's assertion that, "The least governed is the best governed." And while considering the policy embedded in our Constitution we may observe the dissertation of Montesquie on the Spirit of the Law:

"When the legislative and executive powers are united in one body or person there can be no liberty because apprehension may arise lest the same monarch or senate should enact tyrannical laws to execute them in a tyrannical manner. * * * Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control for the judge would be the Legislature. Were it joined in the executive the judge

might behave with all the violence of an oppressor."

Now notice the provisions for the exercise of judicial power contained in section 6 of the act, the rule making power in section 3, and bear in mind the general executive power possessed by the Corporation Commission. Can the conclusion be other than herein one agency, by act, without sanction of the Constitution, but in direct violation of both its spirit and letter, is sought to be vested legislati e, executive and judicial powers, all inclusive of powers of government, which is to say that as applied to this private business, and as applied to these property rights, this agency is possessed with the power of an oriental despot.

When Madison said: "The entire Legislature again can exercise no executive prerogative," he expounded a principle wherein the reverse ought to be true, which is that an executive department or agency should exercise no legislative function. But by the act which is by its definition all inclusive of physical waste, economic waste, waste actual and waste anticipated, the Legislature says in effect, "All is prohibited and power is conferred upon this agency to determine when and where the law to be made by this agency shall be applied."

It is my view that such act is not a valid exercise of police power, for this power to legislate is a nondelegable power.

The Ohio Oil Co. v. Indiana, 177 U. S. 190, cited and relied upon, concerned a physical waste of gas. It must be remembered that gas is by its nature very different from petroleum; it cannot be stored, its migratory propensities are infinitely more pronounced than those of oil, when discovered it must be confined or put to immediate use and upon the presence of gas depends to a large extent the reach and production of oil. There is no doubt that a police statute designed to prevent the escape of gas into the air or even its physical "wasteful utilization," as in the Carbon Black Cases, is sound. Quinton O. & G. Co. v. Corp. Comm., 101 Okla. 164, 224 Pac. 156; Walls v. Midland Carbon Co., 254 U. S. 300; Lindsley v. Natl. Carbonic Gas Co., 220 U. S. 61; State v. Ohio Oil Co. (Ind.) 49 N. E. 809; Commonwealth v. Trent. (Ky.) 77 S. W. 390. Contra: See: Gas Products Co. v. Rankin (Mont.) 207 Pac. 993. And likewise cases construing statutes for safety of people. Winkler v. Anderson, 104 Kan. 1, 177 Pac. 521, the case involving a gas well within 100 feet of the electric railway, as in town lot cases, Marrs v. City of Oxford, 24 Fed. (2d) 541. But those cases having nothing to do with waste in excess of market demands, and anticipated waste as a basis for price fixing.

Article 5, sec. 36, Constitution, relied upon by the majority, relative to the authority of the Legislature extending to all rightful subjects of legislation as a basis for the delegation of such legislative power to the Corporation Commission, is a stretch of that constitutional provision never dreamed of by the framers of the document, and certainly such provision does not strike down safeguards contained in the fundamental law such as article 1, sec. 4, supra, nor that contained in section 2, art. 2: "All persons have the inherent right to * * * the enjoyment of the gains of their own industry."

I am convinced that restrictions on the use of petitioner's valuable property works a taking and damage of that property for a merely purported public use, without just compensation in contravention of section 24, art. 2, Constitution of Oklahoma, if not in violation of the due process provision of the federal Constitution, for as Mr. Justice Holmes said in Pennsylvania v. Mahon, 260 U. S. 393:

"To make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it."

And further:

"The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."

I hold that the circumstances here work a taking and damage to petitioner's private property, for a private use, to wit, benefit of industry in contravention of the provisions of section 23, of art. 2, Constitution.

The very essence of the petitioner's property right in its lease is the privilege of producing oil therefrom. It has expended thereon more than $100,000 in a well, expecting to take all that would flow therefrom, and indeed the royalty owner may exact, under penalty of forfeiture of the lease, a full production. Calor Oil & Gas Co. v. Franzell (Ky.) 109 S. W. 328 and cases too numerous to cite from this court.

One phase of the question is whether the regulations under the police power offends against constitutional guaranties concerning property rights. Block v. Hirsh, 256 U. S. 135. It is my opinion that it does and is an infringement upon vested property rights.

The majority opinion relies upon a departmental construction where it says:

"That portion of the Oil Conservation Act involved in this proceeding has been in effect and has been administered by the Corporation Commission for many years and was before this court in the case of Love v. Boyle, 72 Okla. 300, 180 Pac. 705, as early as 1918."

Such is not the case. The state has never before attempted the enforcement of the act, No doubt for the reason that heretofore it has been considered plainly unconstitutional. The cited case considered merely the divesting of powers, generally, from the Chief Mine Inspector and the vesting of such conservation powers generally in the Corporation Commission. The various laws were mentioned but not construed.

There can be no acquiescence in a regulatory statute unenforced and hence no departmental construction relative to such a statute.

The majority opinion concludes that section 2 of the act, is unconstitutional for it says:

"Section 7955, C. O. S. 1921, which is section 2, of the Oil Conservation Law of 1915, is not involved in this action, and it is not to be assumed that if the Corporation Commission were attempting to fix the market value of oil under that section, we would sustain same."

I agree with that conclusion, but the presumption of law is that a statute is constitutional; since the reverse is here true, section 2 is unconstitutional. Moreover, in the case at bar the Corporation Commission finds in the order of proration:

"That there is a grave condition of over-production of crude oil or petroleum in the state of Oklahoma, and a consequent actual and threatened condition of waste of such petroleum, and that said condition would continue through July, August, and September, 1930."

Wherefore, proration is ordered to "prevent economic waste, underground waste, surface waste and waste incident to the production of crude oil or petroleum in excess of transportation or market facilities or reasonable market demands."

There is no actual waste according to issues joined and so "actual waste," as used in the orders, must be in view of economic waste. Mark you, here is a petitioner who alleges without denial by his adversary that it commits no actual physical waste. It has its own market facilities, and therefore I conclude that the only restriction imposed

upon it in these orders is by reason of "waste" calculated or contemplated in view of market demands and economic waste, which have to do with price standards and over-production, and may as well be applied to the agricultural situation as to the oil business under a paternalistic, discriminative tendency leading to the utter destruction of property guaranties of the federal and state Constitutions.

On page 18 of the brief of the Attorney General and C. B. Ames, it is said as a basis for the law:

"Balancing supply and demand is necessary to preserve the industry."

And on page 4:

"For a long time Oklahoma stood alone in this type of legislation."

Which statements show both departure from conservation statutes of other states and the inapplicability of decisions upon the scope of the act now presented.

The object of the orders and the statute purporting to authorize them are said to be by the brief of the Mid-Continent and sundry producers, on p. 65:

"Furthermore, when production is had under such conditions as those stated, the supply of oil becomes so excessive as compared to the demand that the price paid therefor is reduced to such figure that even those who are able to dispose of their oil must do so at an irretrievable loss on their investment."

That statement evidences the known purpose of the act to be the control of the economic condition without regard to physical waste and is a reasonable and logical conclusion to draw from the words of the act. It is my opinion that our system of government is not patterned to function in such paternalistic manner so as to fix price for the betterment of the industry to the cost of the consuming public. The business of producing and selling oil is not clothed with public interest. Tyson v. Banton, 71 L. Ed. (U. S.) 718; Wolff Packing Co. v. Court of Ind. Relations, 262 U. S. 522.

In the former case Mr. Justice Sutherland said:

"A business is not affected with a public interest merely because it is large or because the public is warranted in having a feeling of concern in respect to its maintenance. Nor is the interest meant such as arises from the mere fact that the public derives benefit, accommodation, ease or enjoyment from the existence or operation of the business."

The rule is settled that a price-fixing stat-

ute will be upheld only when it deals with a business affected with public interest. Dorchey v. Kansas, 264 U. S. 286.

Here the petitioner has a legitimate use for its oil, and production is had without actual waste, nor is petitioner's operations injuring producing formations. It is my opinion that such a producer should be permitted, and has the right, to produce petroleum to capacity and at will.

In West v. Kan. Natl. Gas Co., 221 U. S. 229, it was held that the Oklahoma conservation statute violated the due process clause of the federal Constitution. It seems to me that the statute now presented is equally destructive of property rights guaranteed by both state and federal Constitutions.

For these reasons, I decline to concur in the decision of the majority.

Note.—See under (1) 25 R. C. L. p. 847, et seq.; R. C. L. Perm. Supp. p. 5617; R. C. L. Continuing Perm. Supp. p. 1015.